UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1887(DSD/SRN)

Mississippi River Revival, Inc.
and West Side River Watch, Inc.,

Plaintiffs,

v. **ORDER**

City of St. Paul,

Defendant.

Richard B. Bates, Esq., Bates Law Office, 1985 Grand Avenue, B1, St. Paul, MN 55105, counsel for plaintiffs.

Peter G. Mikhail, Esq., Office of St. Paul City Attorney, 550 City Hall, 15 West Kellogg Boulevard, St. Paul, MN 55102, counsel for defendant City of St. Paul; and Paul Merwin, Esq., Office of Minnesota Attorney General, Suite 1100, 445 Minnesota Street, St. Paul, MN 55101, counsel for defendant Minnesota Pollution Control Agency.

This matter is before the court upon plaintiffs' motion for summary judgment and defendant's motion for judgment on the pleadings or alternatively for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment.

FILED 12-2-2002
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 12-2-02
Deputy Clerk's Initials ______

## BACKGROUND

Plaintiffs Mississippi River Revival Inc. and West Side River Watch Inc. bring this action against defendant City of St. Paul ("St. Paul"), alleging that St. Paul violates the Clean Water Act ("CWA"). Plaintiffs' first claim alleges that defendant violates the terms of its National Pollutant Discharge Elimination Systems ("NPDES") storm sewer permit. (Am. Compl. at ¶ 1.) Plaintiffs' second claim alleges that defendant violates the CWA by discharging pollutants through its storm sewer system. (Am. Compl. at ¶ 1.) Defendant denies the allegations.

### I. The Clean Water Act

In 1972, Congress enacted the Clean Water Act ("CWA" or "Act"), also known as the Federal Water Pollution Control Act. 33 U.S.C. § 1251. Section 402 of the Act, 33 U.S.C. § 1342, provides for the issuance of NPDES permits by the Administrator of the Environmental Protection Agency ("EPA") or by authorized states. NPDES permits impose limitations on the discharge of pollutants and establish related monitoring and reporting requirements in order to improve the cleanliness and safety of the nation's waters. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 174 (2000). The CWA requires an entity to obtain an NPDES permit to discharge pollution from municipal storm sewers into the nation's waters. 33 U.S.C. 1342(p)(3). NPDES permits for

municipal storm sewers require pollution discharge reduction "to the maximum extent practicable ...." U.S.C. § 1342(p)(3)(B)(iii).

Under § 505(a) of the Act, a suit to enforce any limitation in an NPDES permit may be brought by any "citizen," defined as "a person or persons having an interest which is or may be adversely affected."[1] 33 U.S.C. §§ 1365(a), (g). Sixty days before initiating a citizen suit the would-be plaintiff must be given notice of the alleged violation to the EPA, the state in which the alleged violation occurred and the alleged violator. 33 U.S.C. § 1365(b)(1)(A). The purpose of the notice requirement is to allow the alleged violator an opportunity to bring itself into compliance with the Act. Laidlaw, 528 U.S. at 175.

In Minnesota, the responsibility for NPDES permitting has shifted from the EPA to the Minnesota Pollution Control Agency ("MPCA"). See 33 U.S.C. 1342(b)-(c); 40 C.R.F. § 123.25 (2000); Miss. River Rival v. Adm'r, E.P.A., 107 F. Supp. 2d 1008, 1012 (D. Minn. 2000). The MPCA administers and executes NPDES permits pursuant to Minn. Stat. § 115.03, subd. 5. Noncompliance with a permit constitutes a violation of the CWA. 33 U.S.C. § 1342(h). The CWA authorizes district courts in citizen-suit proceedings to

[1] The definition of "citizen" includes associations. See Laidlaw, 528 U.S. at 181 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit"(citations omitted)).

enter injunctions and to assess civil penalties, which are payable to the United States Treasury. 33 U.S.C. § 1365(a).

**II. The City of St. Paul**

On December 1, 2000, the MPCA issued St. Paul a NPDES permit pursuant to 33 U.S.C. § 1342(p)(4). That permit authorizes the city to discharge pollutants from specified point sources into Minnesota water.[2] See 33 U.S.C. §§ 1311, 1342. The terms of the city's NPDES permit also require St. Paul to submit an annual report to the MPCA containing specified information by June 1, 2001. While St. Paul complied with the submission deadline, plaintiffs found the substance of the report to be deficient. Therefore, on August 14, 2001, plaintiffs notified St. Paul that plaintiffs intended to initiate a citizen's suit pursuant to 33 U.S.C. § 1365 to enforce St. Paul's compliance with the city's NPDES permit requirements. In response, St. Paul submitted a revised annual report. Notwithstanding St. Paul's revised submission, plaintiffs remained dissatisfied with St. Paul's disclosures. Plaintiffs therefore filed suit on October 15, 2001. On December 5, 2001, the MPCA approved St. Paul's program and report. (Weber Aff., Ex. 3.)

---

[2] A "point source" is "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

Plaintiffs argue that since the time that the MPCA issued the city's NPDES permit, St. Paul has thwarted both the permit's reporting requirements and the permit's stated purpose of eliminating pollution flow into the nation's water. Specifically, plaintiffs allege that St. Paul's 2001 annual report violates its reporting requirements and that St. Paul has violated the substantive requirements of the NPDES permit by creating an unacceptably high concentration of pollutants in the Mississippi River, Lake Como, Lake Phalen and other receiving waters. Plaintiffs have filed a motion for summary judgment.

In response to plaintiff's motion for summary judgment, St. Paul filed a motion for judgment on the pleadings or alternatively a cross-motion for summary judgment.[3] St. Paul primarily argues (1) that plaintiffs lack standing to bring its 33 U.S.C. § 1365 citizen suit, (2) that plaintiffs' prayer for relief improperly attempts to impose new substantive requirements on St. Paul, (3) that genuine issues of material fact preclude plaintiffs' motion for summary judgment and (4) that the citizen suit provision of the CWA violates Article II of the Constitution

[3] Fed. R. Civ. P. 12(c) treats a motion for judgment on the pleadings as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court...." Since defendant introduced evidence to support its claims and since the court has not excluded that evidence, the court treats defendant's motion for judgment on the pleadings as a motion for summary judgment.

of the United States.[4] (Def.'s Mem. Opp'n Pls.' Summ. J. Mot. at 1-2.) After a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment.

**DISCUSSION**

## I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is

---

[4] The court does not reach defendant's argument that the citizen suit provision of the CWA violates Article II of the Constitution of the United States because the court has disposed of the case on other grounds. See, e.g., United States v. Turechek, 138 F.3d 1226, 1229 (8th Cir. 1998)("While federal courts are obliged to decide constitutional questions when necessary to the resolution of a dispute before them, 'they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration.'")(citation omitted); In re United Missouri Bank, 901 F.2d 1449, 1457-58 (8th Cir. 1990)(stating that a court should avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative raises no constitutional problems).

entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a nonmoving party cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II. Standing**

The parties dispute whether plaintiffs have standing to sue St. Paul. Article III, Section 2, of the United State Constitution permits judicial inquiry only into claims of actual "cases" or "controversies." See U.S. Const. Art III, § 2. To meet the constitutional minimum for standing, a plaintiff bears the burden of proving: "(1) it [the plaintiff] has suffered an 'injury in

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." Laidlaw, 528 U.S. at 180-81 (citations omitted).

The injury-in-fact inquiry in an environmental case focuses on whether plaintiffs have suffered an injury, as opposed to whether the environment has actually been harmed. Laidlaw, 528 U.S. at 181; Piney Run Pres. Assoc. v. County Comm'rs, 268 F.3d 255, 263 (4th Cir. 2001); Ecological Rights Found. v. Pacific Lumber Co., 230 F.3d 1141, 1151 (9th Cir. 2000). In Laidlaw, the Supreme Court held that:

> environmental plaintiffs adequately allege injury in fact when they aver that they used the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.

Laidlaw, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972); see Lujan v. Defenders of Wildlife, 112 S. Ct. 2130 (1992)(stating that purely aesthetic interest is cognizable injury for purposes of standing); Morton, 405 U.S. at 734 ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society ... deserving of legal protection through the judicial process.").

To satisfy the traceability prong, "it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." Friends of the Earth v. Gaston Copper Recycling Corp. 204 F.3d 149, 154 (4th Cir. 2000). Traceability "'does not mean that plaintiffs must show to a scientific certainty that defendant's effluent ... caused the precise harm suffered by plaintiffs.'" Piney Run, 268 F.3d at 263 (quoting Natural Res. Def. Council, Inc. v. Watkins, 954 F.2d 974, 980 n.7 (4th Cir. 1992)). Rather, plaintiffs "'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged.'" Id.

The redressability prong requires that is it likely, and not merely speculative, that a favorable decision will remedy the injury. Gaston, 204 F.3d at 154. The Supreme Court in Steel Co. v. Citizens for a Better Env't held that the redressability requirement is not satisfied when a citizen seeks civil penalties for violations that have abated by the time of the suit. Steel Co., 523 U.S. 83, 106-07 (1998). The Supreme Court in Laidlaw, however, held that civil penalties afford redress to citizen plaintiffs "who are injured or threatened with injury as a consequence of ongoing unlawful conduct." Laidlaw, 528 U.S. at 186.

Here, St. Paul claims that plaintiffs lack standing to prosecute the alleged reporting and effluent discharge violations. The court considers each argument in turn.

**A. Reporting Violations**

Plaintiffs allege that they have standing to sue for reporting violations, including management program violations, because its members are concerned about water pollution in the Mississippi River and other receiving waters. Plaintiffs rely on Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109 (4th Cir. 1988) to support their claim. In that case, plaintiff Sierra Club alleged that the health, recreation, aesthetic and environmental interests of its members had been and were going to be adversely affected by defendant's reporting violations. Id. at 1112. The Fourth Circuit Court of Appeals found that the affidavit adequately established injury and the threat of injury from defendant's failure to report. Id.

Here, each plaintiff has submitted the affidavit of one of its members. The affidavits show that the affiants live near the Mississippi River and use the river and lakes through activities such boating, canoeing, fishing and hiking nearby. Both affiants testified that they are concerned about pollution discharge. Plaintiffs' reliance on Simkins is, however, misplaced. Unlike Simkins, the affidavits that plaintiffs have submitted provide no evidence of actual injury as a result of defendant's alleged

reporting or management program violations. In fact, neither affiants testify to any specific concerns about St. Paul's annual report. Nothing in their affidavits suggest how defendant's alleged reporting violations affected their use and enjoyment of the Mississippi River or lakes. Because plaintiffs have not alleged any particularized injury to their environmental interests resulting from the alleged reporting defects, including management program defects, plaintiffs do not have standing to prosecute those defects.[5] Therefore, the court grants defendant's motion for

---

[5] Alternatively, plaintiffs have no standing to prosecute alleged management program violations because St. Paul never violated the management program. St. Paul's permit requires the city to prepare a management program for the MPCA's review and approval and sets forth guidelines and instructions for the program. (Weber Aff., Ex. 3, p. 7 at 3.2 ("The Permittee shall submit a Management Program by June 1 of each year beginning in 2001 in accordance with the Annual Report requirements, for review and approval by the MPCA.").) The MPCA approved St. Paul's program on December 5, 2001. Because St. Paul's program satisfied the MPCA, St. Paul did not violate a term or condition of the permit. Plaintiffs therefore have no standing to sue for program violations.

Plaintiffs nevertheless argue that they have standing to prosecute alleged management program violations because the MPCA did not issue its official approval of St. Paul's program until after plaintiffs' commenced suit. While it is true that standing is determined at the time the complaint is filed, no violation and thus no injury could have occurred at the time plaintiffs filed suit in October, 2001, because the permit expressly commits approval of the management program to the MPCA's discretion and the MPCA had not yet accepted or rejected the management program when the complaint was filed. Put another way, because the permit commits approval of the program to the MPCA's discretion, whether St. Paul violated the permit was indeterminate until the MPCA expressed its approval or rejection of the program on December 5, 2001. Thus, plaintiffs do not establish injury in fact at the time the complaint was filed because St. Paul had not violated the terms (continued...)

summary judgment on plaintiffs' claim I of the amended complaint. (Am. Compl. at 3.)

**B. Effluent Violations**

St. Paul concedes that plaintiffs have standing to sue for alleged effluent violations. (Reply Mem. in Supp. Def.'s Mot. for J. Pleadings at 4 ("Saint Paul does not dispute that MRR has standing to sue for alleged effluent violations.").) As in Laidlaw, 528 U.S. 183-84, where the affiants asserted that defendant's discharges directly affected their recreational interests, plaintiffs establish injury in fact through the affidavits of Mr. Sol and Mr. Boyce who allege that St. Paul's discharges directly affect their recreational interests. Plaintiffs establish traceability by showing that the affiants' complain of harm caused by fecal coliform bacteria, mercury and phosphorus in the relevant waters, that the affiants regularly use the waters and that St. Paul discharges those pollutants into those waters. See e.g., Piney Run, 268 F.3d at 263-64 (stating that plaintiff must show that defendant discharges a pollutant that causes or contributes to the injuries alleged). Plaintiffs establish redressability because the injunction that they request would decrease the complained of pollution. Steel Co., 523 U.S. 83

---

[5](...continued)
of its permit pertaining to the management program when the complaint was filed and because plaintiffs present no evidence that plaintiffs interests were injured as a result of any alleged reporting or management program violation.

at 108 (suggesting that injunctive relief satisfies redressability where it will enjoin a continuing violation or an imminent future violation) Thus, plaintiffs have established standing to prosecute St. Paul's alleged effluent violations.

**III. Effluent Violations**

The court next considers the parties' cross-motions on plaintiffs claim that St. Paul is violating water quality standards in their permit. Plaintiffs' allegations that St. Paul is violating water quality standards in its permit are erroneous because St. Paul's storm water permit does not require that St. Paul comply with water quality standards.

For industrial water discharges, the CWA requires that "permits for all discharges associated with industrial activity comply with all applicable requirements of this section and section 1311 of this title." 33 U.S.C. § 1342(p)(3)(A). Industrial discharges therefore must comply with state water-quality standards. See Defenders of Wildlife v. Browner, 191 F.3d 1159, 1165 (9th Cir. 1999).

However, unlike industrial storm water discharges, the CWA does not require water quality-based standards for municipal storm water discharges. See Defenders of Wildlife, 191 F.3d at 1165-66 (holding that Congress did not require municipal storm-sewer discharges to comply strictly with water-quality standards). Instead, Congress required municipal storm-sewer discharges "to

reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and systems, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii). That requirement does not incorporate the water quality-based requirements of 33 U.S.C. § 1311. As the court in Defenders of Wildlife stated: "Congress' choice to require industrial storm-water discharges to comply with 33 U.S.C. § 1311, but not to include the same requirement for municipal discharges, must be given effect.... 33 U.S.C. § 1342(p)(3)(B)(ii) does not require municipal storm-sewer discharges to comply strictly with 33 U.S.C. § 1311(b)(c)." Id. at 1165.

Minnesota rules provide that the MPCA must impose water quality-based effluent limitations or prohibitions in a permit, see Minn. R. 7001.1080, subp. 2, except "[i]f the commissioner finds that it is not feasible to establish an effluent limitation, standard, or prohibition using a numerical value, the commissioner shall establish permit conditions requiring the implementation of best management practices." Minn. R. 7001.1080, subp. 3. For the St. Paul permit, the MPCA determined that numeric limitations based on water quality standards were not feasible because of the unique and variable nature of storm water and instead required best management practices ("BMP"). (See MPCA Findings of Fact at p. 6,

¶ 31.) In fact, the MPCA specifically declined to require St. Paul comply with water quality standards and specifically relied on Defenders of Wildlife in rejecting water quality standards for the permit. (Id. at p. 6-7, ¶ 31.) Thus, plaintiffs cannot now argue that St. Paul's permit requires it to comply with water quality standards that are not in its permit.[6]

Plaintiffs' nevertheless make two arguments in favor of water quality-based standards for the permit: (1) that the permit cover page imposes a substantive requirement that St. Paul comply with water quality standards and (2) that the MPCA's incorporation of federal regulations imposed a substantive requirement that St. Paul ensure compliance with water quality standards. The court rejects both contentions.

The cover page of the permit provides: "The goal of this permit is to protect water quality in accordance with Minnesota and U.S. statutes and rules ..." (Weber Aff., Ex. 3.) While plaintiffs argue that the language imposes substantive water quality requirements, that language does nothing more than indicate that the purpose of the permit is to "protect water quality." St. Paul's permit "protects water quality" through best management practices, not water quality standards.

[6] Mississippi River Revival ("MRR") should understand that the permit does not require adherence to water quality standards since MRR specifically objected to the MPCA's refusal to include in the permit language that required water quality standards. (MPCA Ex. 5, Testimony of Sol Simon, MPCA Permit R. at 2958.0)

Moreover, MPCA's incorporation of federal regulations does not impose a substantive requirement that St. Paul ensure compliance with water quality standards. The permit incorporates the requirements of 40 C.F.R. § 122.41(a)(2)("any person who violates sections 301, 302, 307, 308, 318 or 405 of the Act, or any permit condition or limitation implementing any such sections in a permit ... is subject to a civil penalty"). While CWA requires permits to contain conditions that ensure that water quality standards are met, the CWA specifically exempts municipal storm water permittees from that requirement. See 33 U.S.C. § 1342(p)(3)(B); Defenders of Wildlife, 191 F.3d at 1164-66. Thus, St. Paul does not violate any water quality standards because those standards are not incorporated into its permit. The court therefore grants St. Paul's motion for summary judgment on claim II of the amended complaint. (Am. Compl. at 7.)

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motion for summary judgment [Docket No. 12]is denied;

2. Defendant's motion for summary judgment [Docket No. 18] is granted and plaintiffs' claims are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 2, 2002

David S. Doty, Judge
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.